# In the United States Court of Federal Claims

No. 23-1400C
Filed under seal: December 20, 2023
Reissued: January 4, 2024[*]
FOR PUBLICATION

---

**AEGIS-KK/GARDAWORLD FEDERAL AFRICA, A JOINT VENTURE,**

         *Plaintiff,*

v.

**UNITED STATES,**

         *Defendant,*

**and**

**G4S KENYA JV,**

         *Defendant-Intervenor.*

---

*Gary J. Campbell*, Perkins Coie LLP, Washington, D.C., with *Alexander O. Canizares*, *Miles McCann*, *Jedidiah K.R. Blake*, and *Emily I. Rich*, of counsel, for the plaintiff.

*Ioana C. Meyer*, Commercial Litigation Brach, Civil Division, U.S. Department of Justice, Washington, D.C., *John W. Cox*, U.S. Department of State, of counsel, for the defendant.

*Benjamin Lakin Williams*, Cozen O'Connor P.C., Washington, D.C., for the defendant-intervenor.

---

[*] Pursuant to the protective order in this case, this opinion was filed under seal on December 20, 2023. The parties were directed to propose redactions of confidential or proprietary information by January 3, 2024. The defendant, on behalf of all the parties, submitted proposed redactions on January 3, 2024. (ECF 40.) With one exception, the Court adopts the proposed redactions, as reflected in this public version of the opinion. Redactions are denoted with three asterisks in square brackets, [***].

# MEMORANDUM OPINION

***HERTLING*, Judge**

The plaintiff, Aegis-KK/GardaWorld Federal Africa, a Joint Venture ("GWFA"), is the incumbent contractor providing security services in Kenya to the Department of State ("State"). State issued a solicitation for the continuation of these security services on a lowest priced, technically acceptable basis. Two offerors, GWFA and G4S Kenya JV ("G4S"), submitted proposals. After finding both responses technically acceptable, State awarded the contract to G4S as the lowest-priced offeror. GWFA filed this protest challenging the award to G4S. GWFA alleges that State failed to identify deficiencies in G4S's proposal that rendered it technically unacceptable.

The plaintiff and the defendant move for judgment on the administrative record under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). (ECF 28; ECF 31.) Although G4S intervened, it did not subsequently file any motion or briefs.

The plaintiff argues that G4S's proposal failed to comply with some of the solicitation's requirements, and that these failures required State either to find the proposal unacceptable or to explain why the proposal was acceptable notwithstanding the failures. The plaintiff argues that State's failure to do one or the other was irrational and prejudiced GWFA, as it was the only other offeror and submitted a technically acceptable proposal. The defendant counters that State performed a rational evaluation of G4S's proposal and reasonably determined that G4S's proposal complied with the solicitation's requirements. Even if there were errors or missing information, the defendant argues, State had the discretion under the solicitation to find G4S's proposal acceptable.

The administrative record shows that G4S's proposal was partially deficient, and State accordingly may have had grounds to find it unacceptable. State's review of G4S's proposal, however, fails to explain why that proposal was nevertheless deemed acceptable or even to acknowledge that there were deficiencies. Because these deficiencies may lead State to conclude that G4S's proposal is unacceptable and award the contract to the only other offeror, GWFA, the plaintiff has demonstrated prejudice. The plaintiff has not succeeded on all its claims, however. Therefore, the plaintiff's motion for judgment on the administrative record is granted in part and denied in part, and the defendant's cross-motion is granted in part and denied in part. Award of the contract to G4S is enjoined pending a reconsideration by State of two shortcomings in G4S's proposal.

I.      **BACKGROUND**[1]

A.      **The Solicitation's Requirements**

In September 2022, State released solicitation 19AQMM22R0160, offering a one-year time-and-materials contract with firm-fixed price and cost-reimbursement components, with four additional option years.  (AR 82, 2010.)[2]  Award was to be made to the lowest priced, technically acceptable offeror.  (AR 165.)  The solicitation was amended eight times before it closed on February 24, 2023.  (AR 2010-11.)

The solicitation sought "a qualified Contractor to provide local guard services at the U.S. Embassy Nairobi" in Kenya.  (AR 86.)  The local guard force provided under the contract would serve as "one component of the Mission's security apparatus and complement[ ] other physical, technical, and procedural security systems" to "protect life; prevent unauthorized access; maintain order; deter criminal attacks against employees, dependents, and property[;] prevent terrorist acts against all U.S. assets; and damage to Government property."  (*Id.*)

The solicitation did not specify the number of guards required but instead incorporated Exhibit A "delineat[ing] the current work locations; functions; hours of coverage; days per week and hours per day for the Standard Services required" under the contract.  (AR 84; *see also* AR 86 (noting "[t]he Contractor shall provide Standard Services for the posts set forth in Section J, Exhibit A").)  Exhibit A specified the number of hours required for up to six different types of positions: guard, guard/driver, senior guard, supervisor, shift supervisor, and guard force commander, at three different locations: Nairobi, Kisumu, and Kericho.[3]  (AR 178.)  In addition to these six positions, the solicitation required offerors to provide a project manager.  (AR 104-07.)

---

[1] This recitation constitutes findings of fact based on the administrative record.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-54 (Fed. Cir. 2005).

[2] Citations to the administrative record (ECF 26), as subsequently amended (ECF 27; ECF 30), are cited as "AR" with the pagination reflected in that record as filed with the court.

[3] The solicitation's original Exhibit A provided for a collective total of 3,095,280 hours to be worked under the contract by all employees, except the project manager.  (AR 178.)  Amendment 5 included a revised Exhibit A with a reduced total number of hours of work: 2,566,680.  (AR 539; *see also* AR 613-18 (an updated Exhibit S also using the 2,566,680-hour figure).)  Both offerors used this lower figure as the basis for their final price proposals.  (AR 1828, 1926-29, 1951.)  This total number of hours is also reflected in G4S's final cost estimate included in the awarded contract.  (AR 2242.)  The contract, however, also incorporates an Exhibit A that requires 3,095,280 hours of services.  (AR 2113.)  It is unclear why the number in Exhibit A of the final contract does not match the number of hours in Amendment 5.  Because no party has raised this issue, there is no need to resolve the discrepancy between these figures.

Section L of the solicitation instructed offerors to submit a price proposal, a technical proposal, and certain additional exhibits detailing the offeror's pricing, key personnel, and prior experience.  (AR 133, 149-59.)

Proposals would be evaluated in three phases.  (AR 161-62.)  First, State would review proposals for compliance with Section L.  (*Id.*)  Second, State would perform "[a] price evaluation to determine the total price proposed by each Offeror."  (AR 162.)  Finally, State would evaluate the proposals on a technically acceptable/unacceptable basis.  (*Id.*)

The solicitation explicitly noted that State could reject as technically unacceptable a proposal that merely repeated or paraphrased the solicitation's requirements by "stating the Offeror can and/or will meet the requirements without a detailed description of how the work will be done."  (AR 154.)  Nevertheless, the solicitation allowed State to "waive informalities and minor irregularities in offers received."  (AR 166.)

Price proposals were to be evaluated based on total evaluated price, "including options and any U.S. preference, but excluding VAT, if proposed."  (AR 162.)  The solicitation also noted that "[p]roposals that do not include rates/prices for all line items for the base and option years may be rejected."  (*Id.*)  Further, "[a]ny discrepancies between the staffing, and other direct costs (ODC) stipulated in the technical volume that are not priced or otherwise addressed in the cost volume may be grounds for eliminating the offer from further award consideration."  (*Id.*)  Foreign offerors were required to submit pricing in Kenyan shillings, while U.S. offerors were permitted to submit pricing in U.S. dollars.  (AR 151.)

Technical proposals were to be evaluated according to three factors, two of which contained sub-factors.  The three factors were a management plan, a preliminary transition plan, and the offeror's past performance.  (AR 154, 162-65, 1810-19.)  "To be considered technically acceptable, the technical proposal must provide the information requested in Section L, conform to the requirements of the solicitation and demonstrate[ ] the ability to perform the prospective contract successfully."  (AR 163.)  The solicitation also noted that "[a] rating of 'unacceptable' for any sub-factor . . . may render the entire Technical Proposal unacceptable."  (*Id.*)

Sections L and M of the solicitation contained additional technical requirements and instructions for offerors concerning pricing, prior experience, documentation about key personnel, licensing, and, if an offeror was a joint venture, information about the joint venture's constituent entities.

On pricing, the solicitation required all offerors to complete the tables provided in the pricing schedule in Exhibit S.  (AR 151.)  These tables covered the hourly rates for all standard services, additional or emergency services, optional services, other direct costs, and a total price ceiling.  (AR 323-27.)  The Exhibit S hourly-rate table for the base contract year is reproduced below:

| CLIN | SECTION B CATEGORY | Nairobi | Kisumu | Kericho | Annual Hours | Unit of Measure | Unit Rate | Extended Total |
|---|---|---|---|---|---|---|---|---|
| | **BASE YEAR** | | | | | | | |
| | **Mission Kenya** | | | | | | | |
| | **Standard Services** | Nairobi | Kisumu | Kericho | Annual Hours | Unit of Measure | Unit Rate | Extended Total |
| 0001 | Guard Force Commander | 3,120 | | | 3,120 | HR | | $0.00 |
| 0002 | Shift Supervisor | 12,504 | 3,120 | | 15,624 | HR | | $0.00 |
| 0003 | Supervisor | 51,744 | 20,640 | | 72,384 | HR | | $0.00 |
| 0004 | Senior Guard | 234,588 | 78,840 | 17,520 | 330,948 | HR | | $0.00 |
| 0005 | Guard/Driver | 122,640 | 26,280 | 8,760 | 157,680 | HR | | $0.00 |
| 0006 | Guard | 2,183,304 | 284,040 | 48,180 | 2,515,524 | HR | | $0.00 |
| | | 2,607,900 | 412,920 | 74,460 | 3,095,280 | Subtotal Standard Services | | $0.00 |
| | **Additional or Emergency Services** | | | | | Unit of Measure | Unit Rate | Extended Total |
| 0007 | Supervisor | 1,552 | 619 | | 2,171 | HR | | $0.00 |
| 0008 | Senior Guard | 7,038 | 2,365 | 526 | 9,929 | HR | | $0.00 |
| 0009 | Guard | 65,499 | 8,521 | 1,445 | 75,465 | HR | | $0.00 |
| | | 74,089 | 11,505 | 1,971 | 87,565 | Subtotal A&E Services | | $0.00 |
| | **Other Direct Costs** | | | | # of Units | Unit of Measure | Unit Rate | Extended Total |
| 0010 | Mobile Patrol Vehicles | | | | 12 | mo | | $0.00 |
| 0011 | Local Guard Force Equipment | | | | 12 | mo | | $0.00 |
| 0012 | Reimbursable Materials* | | | | 1 | NTE | $5,000.00 | $5,000.00 |
| | | | | | | Subtotal Other Direct Costs | | $5,000.00 |
| | **Base Year Summary** | | | | | | | |
| | **Standard Services** | | | | | | | $0.00 |
| | **A&E Services** | | | | | | | $0.00 |
| | **Other Direct Costs** | | | | | | | $5,000.00 |
| | | | | | | | **Subtotal** | $5,000.00 |
| 0013 | VAT/GST | | | | | | $0.00 | $0.00 |
| | | | | | | Total Ceiling Value Base Year | | $5,000.00 |

(AR 324.)

The hourly unit rates provided in this table had to include "wages, fringe benefits, overhead, general and administrative and profit," and had to "be fully supported . . . ." (AR 151.) The solicitation also specified that offerors must provide "supporting documentation" with their tables to allow State to "conduct effective or meaningful reviews of the reasonableness of the proposed rates." (AR 152.) It explicitly noted that the contractor would be responsible for costs required by local labor laws, including bonuses, premiums, and other legally required costs. (*Id.*)

An offeror also had to submit an "Other Than Cost and Pricing Spreadsheet," as set forth in Exhibit M, which would "depict the development of the labor rates proposed" in defined cost categories in specific columns. (*Id.*) These categories covered unloaded hourly rates, per-unit labor-rate escalation, per-unit amounts for several categories of indirect costs, per-unit profit, and the per-unit Defense Base Act ("DBA") insurance cost. (*Id.*; *see also* AR 111 (specifying DBA insurance requirements).) Proposals had to "display all formulas used in the appropriate data cells" of Exhibit M. (AR 152.)

Relatedly, the solicitation contained a significant number of requirements and restrictions as to the incumbent guard force and its pay.  Offerors were forbidden from reducing the pay or benefits of incumbent guards.  (AR 718.)  Additionally, all proposed pay and benefits had to meet the pay and benefit baseline established in the transfer of undertaking ("ToU") document added by Amendment 6 to the solicitation.[4]  (AR 521, 638, 641.)

As to experience, Section M.2.2.2.3 required that an offeror "have experience performing similar security services that are of the same or similar size and complexity in the past three years in the country of performance."  (AR 165.)  An earlier section defined "[s]imilar size [to] mean[ ] approximately 90% of the size of this requirement in terms of manpower and total annual hours of security services."  (AR 158.)  For offerors that were joint ventures, "at least one member . . . must meet the requirement to provide similar security services that are of the same or similar size and complexity over the past three years in the country of performance."  (AR 165.)  The solicitation also explained that "joint venture partnerships with less than one year of experience working together on security contracts in the last three years will be deemed unacceptable."  (*Id*.)  A joint venture offeror had to "clearly indicate those examples where the entities performed together" in the offeror's Exhibit N (AR 158), which is entitled "Offeror Organizational Entities Performing and Managing the LGP Contract" (AR 133 (casing modified)).  If an offeror failed to "demonstrate prior experience performing similar security services," then it "w[ould] not be considered eligible for award."  (AR 165.)

On key personnel, the solicitation required certain documentation about the proposed guard force commander and the project manager.  (AR 107, 156.)  If the proposed key personnel were not currently employed by the offeror, the offeror had to provide two things: (1) "employment agreements, including compensation arrangements," and (2) "a letter of intent signed by the prospective employee that includes the terms of the employment offer and specifics of the compensation package."  (AR 156.)

Regarding licensing, Section H required the awardee to "obtain all permits, licenses, and appointments required for the execution of work . . . in compliance with host country laws. . . . Failure to be fully licensed within 30 days of contract award may result in contract termination."  (AR 110.)  Section L also required offerors to "demonstrate their ability to meet the mandatory thirty (30) day licensing requirement . . . .  Offerors that do not demonstrate a clear understanding of host country licensing and permit requirements, and the ability to obtain

---

[4] The ToU was added by Amendment 6 "in lieu" of the collective bargaining agreement that had covered the guards on the predecessor contract as the "accurate baseline for local guard force salaries."  (AR 638.)  The ToU shows the current basic salary, overtime pay, and public holiday pay, as well as the housing allowance, cleaning allowance, commuter allowance, leave allowance, meal allowance, and night shift allowance provided to guards, guard/drivers, senior guards, and supervisors.  Amendment 8 further clarified that "[t]he ToU was provided to bidders to set the baseline for all bidders.  The [collective bargaining agreement] [a]mendment is not the current baseline for local guard force salaries."  (AR 711.)

required licenses and permits within the allotted timeline, will not be considered for award."
(AR 158.)  The solicitation further explained that "[s]imply stating that the offeror holds, or has
applied for, licenses is unacceptable."  (*Id.*)  Instead, offerors had to identify all required licenses,
explain the status of those licenses, provide copies of any current local licenses, and copies of
any applications "submitted to the cognizant licensing activities."  (*Id.*)

Finally, offerors had to include "the following biographic data on the owners, officers
and other key personnel: [f]ull legal name, [d]ate of birth, [p]lace of birth, [n]ationality,
[p]assport information and bio page, [c]ount[ry] of residence, to include address, and [b]rief
synopsis of the personal history, to include education, business interests, and professional work
history."  (*Id.*)  Exhibit N also had to include information about the offerors themselves,
including the "[f]ull name of any/all affiliated or associated business."  (*Id.*)  The information
provided was to be used to run checks to determine if the offeror "is [a] financially sound,
ethical, and legitimate business.  If such ability is not demonstrated, the offeror may be
deemed[ ] unacceptable."  (AR 165.)  If an offeror was a joint venture, then this biographical and
business information was required for each joint-venture entity.

## B.      Bid Submissions, Evaluations, and the Award Decision

The plaintiff and G4S submitted timely proposals.[5]  (AR 2012.)  In March 2023, a
competitive range was established after both proposals were evaluated by a technical evaluation
panel ("TEP").  (AR 1841-46.)

The TEP rated GWFA's proposal as unacceptable based on unacceptable past
performance; the TEP also found GWFA's management plan unacceptable based on one sub-
factor.  (AR 1843-44.)  Nevertheless, the TEP determined that GWFA's proposal, "although not
yet technically acceptable, will have a reasonable chance of award after entering discussions and
responding to the panel's comments."  (AR 1817.)  The contracting officer sent GWFA a
discussions letter on April 17, 2023, notifying the plaintiff that it had been found to be in the
competitive range.  (AR 1847-50.)

The TEP rated G4S's management plan unacceptable due to several sub-factors.  (AR
1843-44.)  Otherwise, the TEP found the proposal acceptable.  (*Id.*)  The TEP sent G4S a
"Competitive Range Exclusion letter" on April 17, 2023, addressing its technical concerns.  (AR
1851-53, 2016-17.)  Although "[m]ost of these were minor infractions that could have been
cleared with discussions," the TEP found that G4S "did not meet the solicitation requirements in
the Experience subsection per Section L.11.2.2.3 and M.2.2.2.3 and cannot overcome this factor
with proposal revisions and/or discussions."  (AR 1803, 2017.)  These provisions required,
among other things, that joint-venture offerors have worked together on security contracts for at

_____

[5] G4S's proposal consisted of a joint venture among three entities: G4S Secure Integration
LLC, G4S Secure Solutions International Inc., and G4S Kenya Limited.  (AR 1143.)  The three
entities "are all subsidiaries of Allied Universal."  (AR 1618; *see also* AR 1687 (noting that the
three entities "are owned by a common parent").)

least one year in the last three years. (AR 158, 164-65.)  The contracting officer agreed to "[e]xclude G4S from the Competitive Range Determination due to less than a year [joint venture] relationship required by the solicitation."  (AR 1825.)

Shortly thereafter, G4S filed an agency protest challenging its exclusion from the competitive range.  (AR 1855-56.)  In its protest letter, G4S argued that State had taken an "incorrect and overly narrow reading of Section M.2.2.2.3 that neglects to take into account the actual corporate relationship and collective experience among the parties to" the joint venture.  (AR 1856.)  G4S pointed to this statement in its technical proposal:

> "[G4S Kenya Limited ("G4SKE")] is a company owned and operated by G4S for over 50 years in Kenya, exceeding the one year of experience performing security services together as a G4S company.  The relationship of being a fully owned company is much more reliable than a standard Joint Venture.  However to properly organize the relationship we have also created a specific Joint Venture for this contract.  Although the Joint Venture relationship is less than 1 year, working together as a fully owned G4S company, exceeds this requirement."

(AR 1856 (quoting AR 1528).)

G4S argued that State had:

> overlook[ed] the fact that [ ] all the G4S Kenya JV participants operate within a singular corporate structure <u>and</u> the G4SKE's over 50 years of experience.  Additionally, unlike a conventional joint venture, in which the working relationship and history among unrelated parties may be much more critical for evaluation, the corporate structure in this case negates such concerns given the common ownership and consistent working relationships among the subsidiaries.

(*Id.* (emphasis in original).)

G4S claimed that State had previously "accepted this joint venture structure in other, comparable solicitations, recognizing that three interrelated corporate entities held the necessary experience to qualify for the competitive range."  (*Id.*)

The contracting officer forwarded this correspondence to State's Legal Adviser for Buildings and Acquisitions.  As State's decision memorandum explained:

> On 28 April 2023, [the legal adviser] responded to the [contracting officer] and informed that G4S had a compelling argument.  G4S should not be excluded from the competitive range if all constituent members within a [joint venture] have worked together in-country for years under other forms of corporate organization.  G4S should

> be admitted back into the competitive range and *asked for more*
> *information on this point in discussions*.

(AR 2017 (emphasis added).)  The contracting officer sent a letter notifying G4S that its protest had been successful, and it had been determined to be in the competitive range.  (AR 1943-45.)

After discussions, GWFA and G4S submitted final proposal revisions on May 24, 2023. (AR 2011.)  The TEP evaluated both proposals in late May and early June and found that both vendors "appear to be technically acceptable and have a reasonable chance of award," with G4S being the lowest-priced offeror.  (AR 2007, 2011, 2014-15, 2017-24, 2026-27.)  Before awarding the contract, the contracting officer also determined that all three parties to G4S's joint venture were responsible.  (AR 2028.)

On July 27, 2023, State notified GWFA that it did not receive the contract (AR 2030-31) and the next day notified G4S that it had been awarded the contract (AR 2032).

###### C.      Procedural History

The plaintiff filed this bid protest on August 23, 2023.  State voluntarily stayed performance of the awarded contract until the earlier of March 31, 2024, or a decision in the protest.  (*See* ECF 33 at 22; ECF 34 at 17.)  G4S intervened.  Other than filing applications for access to protected material, however, G4S did not subsequently file any motions or briefs and attended but did not participate in oral argument.

GWFA moved for judgment on the administrative record on October 3, 2023.  (ECF 28.) The defendant filed its response and cross-motion on October 24, 2023.  (ECF 31.)  The plaintiff and the defendant replied on November 7, 2023, and November 17, 2023, respectively.  (ECF 33; ECF 34.)  Oral argument was held on December 5, 2023.

## II.    JURISDICTION AND STANDING

The Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  Actions brought under this provision are typically called bid protests.

The plaintiff has alleged the defendant violated the law by acting irrationally, unreasonably, and contrary to procurement law when State found G4S's proposal acceptable and awarded it the contract.[6]  (ECF 1 at 9-12.)  Accordingly, the plaintiff's claims fall within the bid-protest jurisdiction of the court.

---

[6] The plaintiff's complaint sets forth three causes of action.  The first claims State failed to evaluate G4S's compensation plan properly.  (ECF 1 at 9.)  The second challenges State's

For a plaintiff to have standing in a bid protest, it "must be an 'interested party,' 28 U.S.C. § 1491(b)(1), that is, a party with a substantial chance of securing the award." *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1152 (Fed. Cir. 2023). The defendant does not challenge the plaintiff's standing. The plaintiff submitted the only other bid, and it was deemed acceptable. (AR 2027.) The TEP found that both GWFA and G4S "have a reasonable chance of award." (AR 2007.) Because GWFA, as the only other acceptable offeror, has a substantial chance of being awarded the contract if G4S's bid is deemed unacceptable, the plaintiff is an interested party and has standing to sue.

## III.   STANDARD OF REVIEW

On a motion for judgment on the administrative record pursuant to RCFC 52.1, the court's review is limited to the administrative record, with findings of fact made as if there was a trial on a paper record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353-56 (Fed. Cir. 2005). The court must determine whether a party has met its burden of proof based on the evidence in the administrative record. *Id.* at 1355-56. Genuine issues of material fact will not foreclose judgment on the administrative record. *Id.* The burden is on the disappointed offeror to demonstrate by a preponderance of the evidence that the agency's decision was arbitrary and capricious. *See XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020); *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018); *Bannum,* 404 F.3d at 1353; *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).

Bid protests require a two-step analysis. *Bannum*, 404 F.3d at 1351. First, the court must determine whether the government's conduct is "arbitrary and capricious" or "not in accordance with law" under 5 U.S.C. § 706. *Id.* (citing 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4)). A court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)). Second, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351. "[T]he second step is always required before setting aside a bid award, regardless of whether the

---

alleged failure to evaluate proposals for price realism. (*Id.* at 11). The third simply seeks injunctive relief for the previous two claims. (*Id.* at 12.) The complaint does not mention, let alone challenge, State's decisions regarding G4S's experience, licensing, letters of intent/employment agreements, or biographical information or lists of affiliated businesses. The plaintiff did not file an amended complaint after the defendant filed the administrative record and only first raised these issues in its opening brief; the defendant did not object to the plaintiff raising challenges beyond the scope of its complaint.

error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021).

When a disappointed offeror challenges a procurement official's decision as lacking a rational basis, "the courts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (cleaned up). "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332-33 (cleaned up).

A court's review of the procurement decision made by the procuring agency in a bid protest is "highly deferential." *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). A court will not disturb an agency's determination so long as there is a reasonable basis for it, even if the court "might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (cleaned up). A court must take care not to substitute its judgment for that of the agency, even if reasonable minds could reach different conclusions. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

## IV.     ANALYSIS

The plaintiff argues State's evaluation of G4S's proposal as acceptable was irrational because G4S: (1) did not include a compliant compensation proposal; (2) failed to meet minimum experience requirements; (3) omitted the required letters of intent and employment agreements for proposed key candidates; (4) did not demonstrate it understood or could meet the requirement to obtain a certain license; and (5) included an Exhibit N that lacked certain required information on two prospective employees and G4S's affiliated businesses.[7]  (ECF 28 at 17-39.)

### A.     The Rationality of State's Evaluation

#### 1.     Pricing

The solicitation required that offerors "demonstrate that the fixed hourly rates contain proposed wages, salaries, and other benefits that are in compliance with local law, other union/labor agreements and decrees." (AR 163.)  More specifically, offerors were required to "submit a total compensation plan setting forth salaries and fringe benefits" and "include an explanation of how the compensation plan was derived. . . .  At a minimum, the offeror should explain whether or not the proposed wages and benefits comply with host-country Government

---

[7] The plaintiff originally made seven arguments in its opening brief but at oral argument expressly waived its challenge to G4S's proposal regarding its comparable in-country experience and the passport pages of the joint-venture partners' owners, officers, and key personnel.

or other official wage and benefit levels, such as union agreements . . . ."  (AR 153.)  The parties dispute the level of detail an offeror had to include to meet these requirements.

The plaintiff argues that G4S's proposal "fail[ed] to demonstrate that its proposed Compensation Plan was in compliance with local labor law, the [collective bargaining agreement], and the ToU."  (ECF 28 at 18.)  The plaintiff claims that G4S's proposal lumped together its direct and indirect costs in Exhibit M without identifying the specific line-item values for each cost, as GWFA did.  According to the plaintiff, G4S's approach makes it impossible to determine the specific costs associated with any individual required benefit or allowance.  Therefore, GWFA asserts, State could not conclude that G4S's proposed pricing complied with the solicitation's minimum requirements or that G4S's compensation plan was realistic.  (*Id.* at 18-23.)  GWFA effectively reads into the solicitation's use of the word "demonstrate" an implied requirement that each offeror provide separate line-items for each cost and allowance to permit State to verify that every required cost and allowance was included in the proposal at the appropriate amounts.  The solicitation, however, does not require this level of detail.

GWFA makes two illustrative points regarding the impossibility of calculating G4S's line-item costs.  First, G4S's failure to include the formulas for how certain data cells in Exhibit M were calculated is "an independent violation of the RFP's requirements that prevents [State] from determining whether G4S's proposed [local guard force] personnel wages and benefits are in compliance with the [collective bargaining agreement] and ToU."  (*Id.* at 23.)

Second, because G4S did not include "any metric representing its total direct labor costs, [State] had no reason to know whether G4S's DBA-related rate would be sufficient."  (*Id.* at 22.)  According to the plaintiff, the absence of the data prevented State from determining whether G4S's proposed DBA rates were reasonable and realistic.  (*Id.* at 22-23.)

The defendant counters that G4S's proposal complied with the solicitation's requirement that offerors "[a]t a minimum, . . . explain whether or not the proposed wages and benefits comply with host-country Government" and the relevant union agreements."  (AR 153; *see also* ECF 31 at 16 (quoting AR 153).)  G4S's proposal satisfied this "minimum" obligation by listing all required benefits, allowances, and minimum salaries in its price proposal and specifying that its pricing complied with local laws and collective bargaining agreements.  Based on the proposal, State was able to determine the points on which G4S's proposal lacked clarity and sought clarification, which G4S provided.  (*Id.* at 18 (citing AR 1946).)  GWFA interprets the solicitation as requiring additional granularity that the defendant contends is not there.  (*Id.* at 15-21.)  Regarding the DBA rate, the defendant argues that there is no requirement in law or the solicitation that an offeror propose a minimum DBA rate, or that the agency determine whether the DBA rate was too low.  (*Id.* at 19-20.)

An agency's decision is rational when the agency "provided a coherent and reasonable explanation of its exercise of discretion."  *Domenico Garufi*, 238 F.3d at 1333.  While a court "may not supply a reasoned basis for the agency's action that the agency itself has not given," a court "will, however, uphold a decision of less than ideal clarity if the agency's path may

reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

The record demonstrates that State rationally concluded that G4S's proposal met the solicitation's pricing requirements. G4S's proposal undisputedly lists all required costs and allowances, as the plaintiff has not identified any required benefit missing from G4S's proposal. G4S's proposal purportedly includes these allowances within the total costs outlined in Exhibit M, the cost spreadsheet, rather than listing each as separate line-items. While the solicitation noted that "[p]roposals that do not include rates/prices for all line items for the base and option years may be rejected" (AR 162), nothing in the solicitation required offerors to provide the level of granularity included in GWFA's proposal. Neither the cost tables in Exhibit M nor those in Exhibit S, attached to the solicitation for offerors to complete, included any line items for individual costs and allowances. (AR 309, 323-27.) Likewise, nothing in the solicitation required State to verify independently that every cost and allowance was correctly totaled. The award is for a firm-fixed-price contract. The potential harm from a miscalculation falls on the offeror.

The solicitation only required "[a]t a minimum" that an offeror "explain whether or not the proposed wages and benefits comply" with requirements. (AR 153.) G4S complied by including all the required allowances (meal allowance, night allowance, housing allowance, and other allowances) and specifically noting they were included in G4S's pricing. G4S also specified whether the costs it included were "Legislated," a "Contract Requirement," or required by the "[collective bargaining agreement]." (AR 1956-57; *see also* AR 1946 (discussing accrual of sick leave, maternity/paternity leave, and vacation time in response to a question from State).)

The plaintiff argues that State could not identify the specific costs or allowances required by the solicitation in G4S's Exhibit M because it lacks the detail needed to make that analysis. The plaintiff argues that G4S's proposal lacks the detail necessary to allow State to know whether G4S's proposal included all the required costs and allowances. It concludes that the decision to accept G4S's proposal was necessarily improper, and GWFA need not show specific evidence of G4S's failure.

A plaintiff cannot sidestep its burden of proof by arguing that it is foreclosed from doing so. GWFA is not foreclosed from providing some support for its argument. Had it identified some allowance that G4S failed to identify, for example, that failure could support an inference that other holes in G4S's proposal existed. Or if GWFA had pointed to a wide discrepancy between its pricing and G4S's pricing, it could argue that discrepancy had to be based on gaps in G4S's proposal. GWFA has failed entirely to present any factual basis from the record that G4S's pricing did not include all required costs and allowances. Its evidence rests on its inability to find evidence because of the way G4S prepared its proposal. That approach can only work if the solicitation required offerors to provide the same level of detail GWFA provided to support its price proposal. It does not.

To the extent the plaintiff argues that State could not verify whether the allowances were included at proper rates because direct and indirect costs were intermingled or because the formulas were not included in the spreadsheets, these arguments assume State had to verify these

13

costs.  The solicitation did not require State to do so but left State with wide discretion in evaluating offerors' pricing.[8]

Even if the solicitation had required a price-realism analysis, GWFA has not claimed that any specific part of G4S's proposed pricing, other than its proposed DBA-insurance rate, was unrealistic.  Without such a claim in its briefing, the plaintiff has waived the issue.  In addition, the plaintiff has failed to show how it was prejudiced by the lack of a price-realism analysis of G4S's proposal because it has not provided any evidence that G4S's compensation rates were unrealistic.

As for the DBA rate proposed by G4S, the plaintiff has again not identified any solicitation language requiring a minimum DBA rate.  This absence stands in contrast to other solicitation requirements covering automobile liability and worker's compensation insurance, for which the solicitation set forth minimum coverage requirements.  (AR 673.)  While GWFA has argued G4S's proposed DBA rate was "unrealistically low" (ECF 33 at 7), it has not explained how or why it is or how State should have known it to be too low.  In the absence of the plaintiff identifying relevant solicitation language setting forth minimum DBA requirements or any evidence to support its claims that G4S's DBA rate was too low, State's decision to find G4S's price proposal acceptable cannot be said to be irrational.

---

[8] At oral argument, the plaintiff suggested that the solicitation's compensation-realism language required State to conduct a price-realism analysis.  The solicitation did not provide that State would "evaluate price proposals to determine whether the offered price reflect a sufficient understanding of the contract requirements."  *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 349 (2009).  Rather, the solicitation allowed State to consider an unrealistic compensation plan "as evidence of failure to comprehend the complexity of the contract requirements."  (AR 153); *see also Rotech Healthcare, Inc. v. United States*, 121 Fed. Cl. 387, 403-404 (2015) (cleaned up) ("Absent instruction from the RFP, the agency would not be required to consider realism in a fixed-price contract because the fixed price task order puts the risk of underpriced offers on the contractor.").  At most, rather than a price-realism analysis, the solicitation required State to consider "whether the employee compensation proposed is reasonable and realistic for the work being performed."  (AR 163.)  Regardless, the plaintiff did not raise a price-realism argument in its briefs.  Instead, the plaintiff argued that "G4S's proposal does not include sufficient information for [State] to determine . . . that G4S proposed rates that were reasonable and realistic for the work being performed."  (ECF 28 at 23.)  In essence, the plaintiff only argued that State had "no basis to determine that G4S's Compensation Plan met" requirements, rather than arguing that State failed to conduct the analysis.  (*Id.* at 18.)  Therefore, notwithstanding GWFA alleging this claim in its complaint (ECF 1 at 11-12), GWFA waived the argument that State failed to conduct a price-realism analysis because it was not raised in its briefs.  (ECF 28 at 18-23; ECF 31 at 5-7.)

2.      **Experience**

The plaintiff challenges both the re-admission of G4S to the competitive range and the award of the contract to G4S by arguing that G4S does not meet the solicitation's experience requirements.  The solicitation provided that an offeror who failed to meet these requirements "will be deemed unacceptable."  (AR 165.)  Unlike other solicitation provisions which "may" result in an offeror being deemed unacceptable, the solicitation did not include a provision granting State the discretion to waive this requirement.

The solicitation contained two relevant provisions on the experience of joint-venture offerors.  Section L.11.2.2.3 required joint-venture offerors to "clearly demonstrate that all of the members of the joint venture have at least one year of experience performing security services together.  [ ] Exhibit N must clearly indicate those examples where the entities performed together."  (AR 158.)  A similar requirement is found in Section M.2.2.2.3, which specified that "joint venture partnerships with less than one year of experience working together on security contracts in the last three years will be deemed unacceptable."  (AR 165.)  State's evaluation of the offers had to be consistent with these requirements.

GWFA's challenge requires careful parsing of what State did.  After conducting the initial TEP review, State excluded G4S from the competitive range because G4S "did not meet the solicitation requirements in the Experience subsection per Section L.11.2.2.3 and M.2.2.2.3 and cannot overcome this factor with proposal revisions and/or discussions."  (AR 2017.)  In doing so, State explained that, because the joint venture "partnership is less than one year" old, it "does not meet the requirements of the RFP and is grounds for disqualification."  (AR 1803.)  State therefore was the first party to suggest that the solicitation required any joint-venture offeror to have been in existence for at least a year.  The solicitation did not, however, include such a provision.  Instead, the solicitation required joint-venture partners to have *worked together* providing security services for one year in the past three years.

G4S submitted an agency-level protest in which it directly challenged State's interpretation of the experience requirement and claimed that its corporate structure met the experience requirement.  (AR 1855-56.)  G4S explained that the three entities (as noted in footnote 5, above) that form its joint venture were nested together under the same corporate umbrella and had worked together.  It argued that the common corporate relationship obviated the concerns attending joint ventures composed of unrelated entities.

State admitted error and conditionally re-admitted G4S to the competitive range.  (AR 2017 (emphasis added) ("G4S should be admitted back into the competitive range and *asked for more information on*" its experience).)  State explained that "G4S should not be excluded from the competitive range if all constituent members within a [joint venture] have worked together in-country for years under other forms of corporate organization."  (*Id*.)  State required G4S to clarify its corporate structure in discussions, requesting it "explain in depth your corporate structure and JV partnership as it pertains to experience and past performance, particularly regarding the JV members' experience performing security services together."  (AR 1944.)  This clarification request confirms that State had no concern that G4S's joint venture was less than a year old but still had questions about G4S's joint-venture partners' experience working together.

GWFA argues that the relevant solicitation provisions required an offeror that was a joint venture to be at least one year old to be considered acceptable.  It contends that State's re-admission of G4S to the competitive range impermissibly relaxed this requirement without amending the solicitation.  (ECF 28 at 24-27.)  In response, the defendant argues that State did not amend the solicitation requirement but determined instead that G4S met the requirement. (ECF 31 at 21-24.)

The applicable solicitation provisions do not require that a joint venture be at least a year old.  Instead, they require joint-venture partners to "have at least one year of experience performing security services together" (AR 158) and provide that "joint venture partnerships with less than one year of experience working together on security contracts in the last three years will be deemed unacceptable" (AR 165).  The solicitation focuses on the joint venturers working together, not on how long the joint venture has existed.  As an example, consider if three unrelated companies had for years provided security services at the same facility in Kenya, with one providing internal building security, a second providing external, perimeter security, and a third providing remote-monitoring services; the three companies would have years "of experience performing security services together" and, depending on how the arrangement was structured, years "of experience working together on security contracts."  In this example, the three companies could form a new joint venture eligible to submit an offer under the solicitation, even if the joint venture itself was less than a year old.  GWFA's effort to conflate the requirement that joint venturers have worked together for a year with the joint venture having existed for a year fails under the plain terms of the solicitation.

State acted properly when it realized its initial interpretation of the experience provisions requiring joint ventures themselves to be at least a year old had been too narrow.  State then sought further clarification from G4S about how the three entities of its joint venture had worked together.

State erred, however, when it found in its final evaluation that, based on the record before it, G4S met the solicitation's experience requirement.  G4S's agency-protest letter only raised the prospect that it met the experience requirement because "G4S Kenya JV participants operate within a singular corporate structure and [ ] G4SKE [has] over 50 years of experience."  (AR 1856 (emphasis in original).)  The letter did not claim that the three G4S-related entities forming the joint venture had experience providing security services together.  The difference is obvious. Simply because entities are in the same corporate family and that family has 50 years of experience does not mean that the various entities within that family have worked together providing security services for at least a year.

The record does not show that G4S's joint-venture entities have experience working together in providing security services.  Although the solicitation required G4S to make clear in its Exhibit N the instances when the joint-venture entities worked together (AR 158), there is no overlap in G4S's examples between work performed by G4SKE and work performed by the other two G4S entities.  (*Compare* AR 1691-95 (listing only work done outside of Kenya for two G4S entities) *with* AR 1696-1700 (listing only examples of work done in Kenya for G4SKE).) Further, although State requested additional clarification as part of discussions about G4S's corporate structure and the experience of its subsidiary entities working together (AR 1944), the

record does not reflect that G4S ever claimed that the three joint-venture entities had experience performing security services together.  (AR 1947.5-.6)[9]  Rather, G4S reiterated that "all the G4S Kenya JV participants operate within a singular corporate structure" and noted G4SKE's "over 50 years of experience."  (AR 1947.6.)  While G4S claimed that "the member organizations have decades of operational relationship and parent ownership as a part of the G4S/Allied universal organization" (*id.*), it neither claimed nor showed that the three joint-venture entities had the required "one year of experience working together on security contracts in the last three years." (AR 165.)

Being in the same corporate family with vague "operational relationship[s]" is not the same as "working together on security contracts in the last three years."  State's conclusion that G4S met the experience requirement of the solicitation was irrational.

The defendant argued orally that the specific requirements of the experience provisions can be overcome if an offeror shows that it met the goals of the experience provisions in other ways.  The defendant relied on the solicitation provision that required joint ventures to assure State that the joint-venture structure is workable.  Specifically, Section L.11.2.1.2 required joint-venture offerors to provide information in their management plan on "[h]ow the joint venture partners plan to mitigate and manage the possible performance risk of the joint venture parties and successfully collaborate and cooperate while performing this contract."  (AR 156.)  This required information, however, cannot supersede the other mandatory requirements set out in the solicitation for joint ventures.  This provision does not provide a basis for State to waive the experience requirement *sub silentio* simply because State was reassured that the joint venture was workable.

The conclusion that State erred in finding that G4S meet the solicitation's experience requirement does not mean that State's error could not be cured with further discussions or an amendment to the solicitation.  It is possible that G4S could clarify that its three joint-venture entities have worked together for at least one year providing security services.  If G4S can make the showing, then it is qualified for award under the solicitation.  If G4S cannot make the showing, then G4S is not qualified.  In such a case, State could either award the contract to the plaintiff or amend the solicitation to waive this requirement in cases in which the joint venture entities have been part of the same, long-standing corporate family.  In any case, the administrative record does not show that G4S met the mandatory experience requirement set forth in the current solicitation.

### 3.   Letters of Intent/Employment Agreements

The plaintiff next challenges G4S's compliance with the solicitation's requirements concerning letters of intent and employment agreements for key personnel.  Section L.11.2.1.3

---

[9] Pages AR 1947.1 through AR 1947.6 are G4S's Final Proposal Revision – Technical.  (ECF 27-1 at 4.)  These pages were inadvertently excluded from the initial administrative record and were added after the defendant moved to correct the administrative record.  (ECF 27.)

required offerors to provide two specific documents for individuals proposed as key personnel who did not currently work for the offeror: "employment agreements, including compensation arrangements" and a "letter of intent signed by the prospective employee that includes the terms of the employment offer and specifics of the compensation package." (AR 156.)

G4S submitted letters addressed to G4S from its proposed project manager and proposed commander of the guard force. (AR 1579, 1583.) The plaintiff claims that the two letters are merely letters of interest, not letters of intent or employment agreements. (ECF 28 at 29-30.) The defendant counters that the letters are qualified letters of intent because the letters each at some point refer to themselves as such. The defendant adds that the letters are also employment agreements because each letter sets forth a salary for the position. (ECF 31 at 26-28.)

The proposed project manager's letter reads that the "letter constitutes my interest in being considered for the position of Project Manager for the U.S. Embassy contract, if G4S is awarded the new contract currently under re-bid at this time." (AR 1579.) The letter goes on to call itself a "Letter of Intent" and notes that it "is based on our agreement of a competitive gross monthly salary of [Kenyan shillings] [***] pay."

The proposed guard force commander's letter is captioned a "Letter of Interest" and notes that it "constitutes my interest in being considered for the position of Guard Force Commander for the U.S. Embassy contract, if G4S is awarded the new contract currently under re-bid at this time." (AR 1583.) It too goes on to call itself a "Letter of Intent [that] is based on our agreement of a competitive net monthly salary of [Kenyan shillings] [***] pay." Both letters go on to note the need for each manager to be available 24/7, to be dedicated to the contract, and to describe the responsibilities of the position. Nothing else relevant to the letters of intent and employment agreement requirements of Section L.11.2.1.3 was submitted by G4S.

While the letters are ambiguous as to whether they are letters of intent or interest, they do not on their own meet the solicitation's requirements. In addition to providing a letter of intent for future employees, the solicitation required offerors to include employment agreements with incoming key personnel. The letters do not reflect any agreement by G4S to hire these persons if G4S is awarded the contract. An employment agreement must show an agreement exists between the employee and employer. At best, these are letters of intent that "include[ ] the terms of the employment offer and specifics of the compensation package." (AR 156.) They reflect the agreement of the key personnel to work for G4S, with no indication of agreement by G4S to hire these persons. The letters suggest that such agreements exist, as each letter notes "[t]his Letter of Intent is based on our agreement." (AR 1579, 1583.) A prospective employee's implied statement that an employment agreement exists cannot itself be an employment agreement. G4S was obligated under the solicitation to provide the employment agreements with key personnel; it did not do so.

Section M.2.2.1.3 noted that the failure of a proposal to comply with the requirements of L.11.2.1.3 "may" lead State to find the key-personnel sub-factor unacceptable. (AR 164.) Agencies must provide a "'coherent and reasonable explanation of [their] exercise of discretion'" when arriving at a technical conclusion. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Domenico Garufi*, 238 F.3d at 1333). The Award Memorandum

18

fails to note G4S's deficiency, fails to evaluate the deficiency, and does not provide any explanation for State's conclusion that G4S's proposal on the key-personnel sub-factor was acceptable. A court must evaluate an agency's action based on the reasoning offered. *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943). State "'entirely failed to consider an important aspect of the problem'" by not even recognizing there was a problem with the sub-factor. *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *State Farm*, 463 U.S. at 43). This deficiency is not unimportant. Without the submission of the employment agreements, as required by the solicitation, State could not know whether G4S had secured the employment of its proffered key personnel.

State's reasoning as to the key-personnel sub-factor cannot "reasonably be discerned," *State Farm*, 463 U.S. at 43, and the challenged agency action cannot be evaluated "on the basis of the record" without further explanation. *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985). Remand is therefore appropriate to allow State to provide further explanation of its decision on this sub-factor.

### 4.    License Requirement

Section L.11.2.2.2 of the solicitation required all offerors to "demonstrate their ability to meet the mandatory thirty (30) day licensing requirement" set forth in Section H.10. (AR 158.) "Offerors that do not demonstrate a clear understanding of host country licensing and permit requirements, and the ability to obtain required licenses and permits within the allotted timeline, will not be considered for award." (*Id.*) Section H.10 required the awardee to obtain "permits, licenses, and appointments required for the execution of work under this contract . . . in compliance with host country laws" within 30 days of contract award. (AR 110.)

Section M.2.2.2.2 required an offeror to "address each element in Section L.11.2.2.2" in its preliminary transition plan. (AR 164.) Section M.2.2.2.2 further indicated that State would "consider the extent of the offeror's understanding of and the ability to obtain and maintain all required licenses and permits," and that a proposal "[s]imply stating that the Offeror holds, or has applied for, licenses and permits is unacceptable." (*Id.*)

The plaintiff argues that G4S failed to demonstrate its ability to obtain the legally required Private Security Regulatory Certificate ("PSRC"). The plaintiff asserts that G4S was ineligible for the PSRC when it submitted its offer. Kenyan law requires foreign companies to "ha[ve] at least twenty five percent local shareholding" to be eligible for the PSRC. (ECF 28 at 31-32 (citing the Private Security Case Regulation Act, No. 13 (2016), https://www.psra.go.ke/wp-content/uploads/2022/02/Private-Security-Regulation-Act-13-of-2016.pdf).) GWFA argues that G4S did not demonstrate its ability to meet the requirement within 30 days of contract award because G4S explained that it would take months to bring itself into compliance with the requirement to have 25 percent local ownership of the joint venture. The plaintiff also argues that G4S's submissions demonstrate a lack of understanding of the licensing requirements because G4S noted its PSRC was "'[v]alid for 6 months'" but also had "'[e]xpired 31/10/22'" when it appeared G4S had only submitted a letter in which it requested a six-month extension of its existing PSRC with no indication it had been granted. (ECF 28 at 30-36 (quoting AR 1666).)

19

The defendant argues that G4S adequately demonstrated that it understood the licensing requirement, including how to renew its PSRC, and that G4S adequately demonstrated it was in the process of renewing its PSRC. The defendant notes that G4S requested a six-month extension of its PSRC pending achieving full compliance with Kenyan law. Finally, the defendant notes that the contract was not awarded until July 27, 2023, nine months after the expiration of G4S's PSRC. This meant that even though G4S thought it would take months to come into compliance and renew its PSRC, nine months was sufficient time for State reasonably to conclude G4S could have come into compliance within 30 days of contract award. (ECF 31 at 28-30.)

The plaintiff has failed to meet its burden to show that State's decision was irrational. The plaintiff has not pointed to a specific, objective requirement of the solicitation that G4S's proposal did not meet. Instead, GWFA relies on a provision that requires a judgment call: did G4S in its submissions "demonstrate . . . the ability to obtain required licenses and permits" within 30 days of the contract award. (AR 158.)

While State did not offer an explicit rationale for its conclusion that G4S satisfied the solicitation's requirement, its rationale is reasonably discernable: it thought that G4S's assurances that it would come into compliance with Kenyan law within months were sufficient. *See State Farm*, 463 U.S. at 43 (cleaned up) (courts "will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). On the record available, this conclusion was rational.

State could evaluate G4S's submission in context; it need not blind itself to reality. G4S disclosed to State that at the time it submitted its offer it was providing, or had provided in the past security, at 54 U.S. diplomatic facilities around the world. (AR 1677.) Like the plaintiff, G4S is an experienced provider of such services, and regularly sells these services to State. Knowledge of G4S's extensive global experience in providing security services can be charged to State as it evaluated the proposals.

Against that background, on this record State had no reason to think G4S could not meet the licensing requirement in the months State presumably knew it would take to award the contract. While the plaintiff is correct that G4S's submissions could have been clearer that G4S's PSRC was expired and that it had sought, but not yet been granted, a six-month extension (AR 1666 (G4S's description of the status of its PSRC), 1670-71 (G4SKE's letter to the Kenyan Private Security Regulatory Authority requesting a six-month extension of its PSRC)), this confusion did not show that G4S misunderstand the licensing requirements. Instead, G4S identified the licensing requirement it had to meet and explained the steps it was taking to meet it. (AR 1666.) While G4S noted that it "could take a number of months to finalise" the implementation of the local ownership structure, it also indicated that a six-month extension of its existing PSRC "would be sufficient" to do so. (AR 1670-71.)

G4S acknowledged the requirements of Kenyan law, demonstrated it understood what was necessary to obtain a PSRC, and stated it would not take more than six months to comply.[10] Given the nine-month period between the submission of offers and contract award, State's conclusion that G4S had demonstrated an understanding of and the ability to meet the licensing requirement was rational.

### 5.    Required Information on Affiliates and Officers

Section L.11.2.2.3.1 required each offeror to provide in Exhibit N certain "biographic data on the owners, officers and other key personnel" and the "[f]ull name of any/all affiliated or associated business."  (AR 158.)

The plaintiff argues that G4S failed to include biographic information concerning two persons, [***].  (ECF 28 at 37-38 (citing AR 1670).)  GWFA also argues that G4S failed to include the names of all businesses affiliated or associated with Allied Universal, G4S's parent company.  GWFA identified numerous affiliates and associated firms omitted from G4S's Exhibit N by reviewing Allied Universal's website and searching other cases litigated in the Court of Federal Claims involving other G4S companies. (ECF 28 at 36-38.)

The defendant argues that G4S included all the information required by the solicitation. Concerning [***], the defendant argues that he is only a putative investor and not an owner because "there is no confirmation in the record that he did in fact invest in the company, or that his possible investment interest was also ownership."  (ECF 31 at 32.)  As for [***], the defendant admits that information about him was omitted but argues that the omission was not prejudicial as the record does not reflect that he had any role in day-to-day operations or played a principal decision-making role.  The defendant further argues that even if the omissions constituted errors, they were minor.  (*Id.* at 32.)

As for the affiliated companies, the defendant argues there was no error because "the requirement was only to identify the affiliates of the companies identified, not to identify *all* affiliates of *any* related entity."  (*Id.* at 31 (emphasis in original).)  The defendant contends the solicitation did not require offerors to identify all entities affiliated with the ultimate owners of each offeror.  (*Id.* at 30-32.)

---

[10] The plaintiff also argues that because G4S did not have 25 percent local ownership, it was operating in violation of Kenyan law and therefore was not a responsible offeror.  (ECF 28 at 35.)  The solicitation tied responsibility to "the offeror's ability to meet the mandatory 30-day licensing requirement."  (AR 164.)  As addressed, State rationally concluded G4S could meet the 30-day licensing requirement.  As for GWFA's argument that G4S may have previously been operating in violation of Kenyan law, G4S had previously been issued a PSRC by Kenyan authorities.  (AR 1666.)  Those authorities were in the best position to judge the requirements of Kenyan law and G4S's compliance with it.  The plaintiff has made no effort to show Kenyan authorities erred in their judgment.

In reply, the plaintiff argues that the omission of information of [***] is significant because a [***] "is traditionally a position of control and influence in any company," and without the required information State could not conduct the vetting required by the solicitation. (ECF 33 at 17-18 (citing AR 165) (noting the "biographic data provided will be run through various database checks").)  As for [***], GWFA points to G4S's plans to have him be a [***]. (*Id.*)

The plaintiff has failed to show State made an irrational decision concerning either [***] or [***].  Concerning [***], GWFA has not identified any language in the solicitation that required offerors to provide biographic information about a [***] of one of the joint-venture entities, even if that [***] was anticipated at the time offers were submitted.  [***] in the future could be addressed through discussions.

As for [***], the solicitation only required G4S to provide "biographic data on the owners, officers and other key personnel."  (AR 158.)  GWFA does not contend that [***] is an owner of a G4S entity, and he was neither G4S's proposed project manager nor its proposed guard-force commander, the only two positions identified in the solicitation as "key personnel." (AR 107.)  Under the solicitation, [***] would have to be a corporate officer for G4S to have been required to supply his biographic information.  The plaintiff has not articulated any argument as to why the chairman of the board of directors is an "officer," under the terms of the solicitation.  The FAR clauses incorporated into the solicitation distinguish between officers and directors.  FAR 52.209-7 separately refers to "an officer" and a "director" in its definition of the word Principal.  (AR 146.)  FAR 652.237-72 notes that "officers of the corporation [ ] are principally responsible for the day-to-day operation of the corporation."  (AR 136.)  In contrast, the same provision explains that "[m]embers of corporation boards of directors do not occupy principal management positions simply by virtue of their service on the board."  (*Id.*)  Section L.11.2.2.3.1 refers to officers and not to directors.  (AR 158.)  G4S was not obligated under the solicitation to supply biographic information for [***].

Finally, regarding the requirement to include "any/all affiliated or associated business" (*id.*), the plaintiff has shown State should have required G4S to submit information about all affiliated entities.  The terms used in the solicitation are broad and cover any business owned by G4S's parent entity.  AFFILIATE, Black's Law Dictionary (11th ed. 2019) (emphasis added) ("1. A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or *sibling corporation*.").

State should have been aware that the G4S joint venture has numerous sibling companies. *See, e.g., Torres Advanced Enter. Sols., LLC v. United States*, 133 Fed. Cl. 496, 500, 514 (bid protest involving a "G4S Joint Venture," consisting of G4S Secure Integration LLC, G4S Secure Solutions International Inc., and Wackenhut Paraguay S.A.); *G4S Secure Integration LLC v. United States*, No. 21-1817C, 2022 WL 211023, at *1 (Fed. Cl. Jan. 24, 2022) (involving a bid protest claim by G4S Secure Integration, LLC, G4S Secure Solutions International, Inc. and G4S Serviços de Segurança Angola), appeal dismissed, No. 2022-1513, 2023 WL 316142 (Fed. Cir. Jan. 19, 2023).  *G4S Secure Sols. (USA), Inc. v. United States*, 146 Fed. Cl. 265 (2019) (involving "G4S Secure Solutions (USA), Inc.").

G4S's proposal also implies the existence of other companies by noting that "[***]." (AR 1525.) The plaintiff has also pointed to press releases by Allied Universal indicating that during 2022 it acquired at least 13 companies, none of which were identified in G4S's proposal. (ECF 28 at 37 (citing Press Release, Allied Universal, Allied Universal Announces Acquisition of Elite Tactical Security in Las Vegas (Apr. 11, 2023), https://www.aus.com/press-releases/allied-universal-announces-acquisition-elitetactical-security-las-vegas).) Notably, the defendant has not objected to this use of evidence outside the administrative record, instead relying on the argument that the solicitation did not require listing all affiliates of Allied Universal.

The term "affiliates," let alone the phrase "any/all affiliated or *associated* business" used in the solicitation (AR 158 (emphasis added)), is broad, and any fair reading would capture sibling companies. The plaintiff has shown that State's failure to require G4S to submit a more comprehensive list of its affiliates and associated businesses was inconsistent with the solicitation. State could not overlook this failure as a minor inconsistency, as it is impossible for State to know what the results of a background check of all affiliated or associated entities may show. (*See* AR 163 ("Furthermore, if the requested information is not contained in the appropriate sections [of the offeror's technical proposal], the offeror's proposal may be deemed unacceptable.").) Negative results could lead to G4S being deemed unacceptable. Knowledge of many G4S-affiliated entities can be imputed to State because of the many contracts State has with G4S-related entities. That imputation is insufficient, however, to satisfy the plain obligations of the solicitation. Ultimately, this error is not prejudicial to the plaintiff, and no relief is necessary.

### B.   Prejudice

"[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision. The protestor must show prejudice under the usual standard." *Sys. Stud.*, 22 F.4th at 998. Thus, the plaintiff must show that it had a "substantial chance it would have received the contract award but for the errors" made in the award process. *Bannum*, 404 F.3d at 1353. As the only other acceptable offeror in a lowest priced, technically acceptable procurement, GWFA must show an error by State that results in a substantial chance of G4S's proposal being found to be unacceptable.

The plaintiff was prejudiced by two of the defendant's errors. First, the solicitation required State to find G4S's proposal unacceptable for its failure to demonstrate the required experience. There is no evidence in the record that G4S satisfied the experience requirement. G4S failed to meet a requirement of the solicitation. The plaintiff is harmed by State's erroneous conclusion that G4S meets the experience requirement for joint ventures. If G4S does not satisfy the experience requirement set out in the solicitation, its proposal must be deemed unacceptable. As the only other offeror, GWFA is prejudiced by the error because it stands to obtain the award if G4S is not qualified for the award and State opts not to amend the solicitation.

Second, GWFA has also shown State has made one other error which may result in G4S's proposal being declared unacceptable, at the agency's discretion. State has not provided adequate explanations on its exercise of discretion to overlook errors with the letters of

intent/employment agreements that G4S submitted for its key personnel, because State did not recognize there were any problems to discuss.  (AR 1990 (finding G4S's proposal's key-personnel sub-factor "technically acceptable" without noting any errors or inadequacies).)  Without an explanation, it is impossible to assess how and whether State properly exercised its discretion, which could lead to State finding G4S's proposal unacceptable, given the importance placed on key personnel.  "[T]he proper course . . . is to remand to the agency for additional investigation or explanation."  *Florida Power*, 470 U.S. at 744.  Once again, as the only other technically acceptable offeror, the plaintiff is prejudiced by State's failure to recognize and address this shortcoming in G4S's proposal.

The plaintiff has not met its burden to show prejudice stemming from G4S's failure to list all its affiliated and associated businesses.[11]  GWFA has not provided any evidence or even an argument that a more thorough list would have led State to check databases that might turn up evidence that G4S is not a "financially sound, ethical, and legitimate business."  (AR 165.)  Neither GWFA nor G4S is unknown to State; G4S has provided security services to U.S. embassies in at least 54 countries.  (AR 1677.)  It is implausible that State would now for the first time discover information that would lead it to question whether it should contract with G4S and give GWFA a substantial chance of award.  On this record, GWFA is unable to show that it suffered prejudice from this error.

## V.    RELIEF

The only remaining issue is the appropriateness of injunctive relief.  The plaintiff seeks an injunction to enjoin performance of the awarded contract and require State to reevaluate offers in accordance with the solicitation.[12]

---

[11] GWFA's proposal also suffered from a similar defect.  A dropdown menu entitled "GardaWorld Companies" on the plaintiff's website refers to two entities, BEST Crowd Management ("BEST") and TalentWorld, that are not listed in GWFA's organizational chart of its affiliates.  (AR 1142.229-.232); GardaWorld, https://www.garda.com/ (last visited Dec. 19, 2023).  According to other pages on the plaintiff's website, these entities have other legal names.  BEST is a d/b/a name for Whelan Event Staffing Services Inc.  BEST: A GardaWorld Company, Privacy and Cookie Policy, https://best.garda.com/privacy-policy (last visited Dec. 19, 2023).  TalentWorld is a division of Garda Security Group G.P.  TalentWorld, Privacy Policy, https://www.talentworld.com/privacy-policy (last visited Dec. 19, 2023).  Neither these business nor legal names appear on the plaintiff's organization chart submitted to State.  GWFA cannot show prejudice due its similar failure.  *See, e.g., G4S Secure Integration, LLC v. United States*, No. 21-1817C, 2022 WL 211023 (Fed. Cl. Jan. 24, 2022), appeal dismissed, No. 2022-1513, 2023 WL 316142 (Fed. Cir. Jan. 19, 2023).

[12] The plaintiff also requests an injunction that requires State to "award the contract to the next lowest-price, technically acceptable offeror."  (ECF 28 at 41.)  The errors made by State are

A court must consider four factors in deciding whether injunctive relief is proper:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC*, 389 F.3d at 1228-29.

The plaintiff has succeeded on the merits as regards its experience, letters of intent, and affiliated company arguments, so the first factor for injunctive relief is met.

### A.    Irreparable Harm

The plaintiff has prevailed on the merits.  Success on the merits can lead to a presumption of irreparable harm.  *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("[A] movant who clearly establishes the first factor receives the benefit of a presumption on the second [factor].").  The loss of potential revenue and profits may constitute irreparable harm for purposes of a permanent injunction.  *See Springfield Parcel C, LLC v. United States*, 124 Fed. Cl. 163, 194 (2015).  "This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm."  *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003) (citing *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000)).

In addition to the presumption of irreparable harm, this is the rare case in which the harm to the plaintiff is evident from the record itself.  The plaintiff is the only other offeror; its bid was found to be technically acceptable.  Any finding that G4S's proposal was unacceptable could result in an award to GWFA.  Although the plaintiff failed to support its claim of irreparable harm with any factual submission, the administrative record supports a finding the plaintiff will suffer irreparable harm absent an injunction.

### B.    Balance of Hardships

Generally, "[a] delay in implementing the new contract . . . , absent exceptional circumstances, does not warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests."  *Mgmt. & Training Corp. v. United States*, 161 Fed. Cl. 578, 618 (2022) (cleaned up).  Here, based on the parties' representations at oral argument, any delay is already accounted for by the bridge contract to GWFA running to August 2024.  In addition, GWFA would suffer financial harm without an injunction to prevent award to an unqualified offeror.

---

potentially correctable through further discussions or amendment to the solicitation.  There is therefore no basis to require State to award the contract to GWFA.

State submitted an affidavit outlining several "potential harms" from an injunction.  (ECF 31-1 at 2.)  These "potential harms" include: (1) increased costs caused by "[o]utdated security measures [which] may not be cost-effective" as well as the "inflated" costs of bridge contracts; (2) "[p]hysically and mechanically worn vehicles, uniforms, and equipment [which] do not portray the U.S. Government in a positive light and could even pose security risks"; and (3) employee dissatisfaction among the local guard force employees, who have lost out on two years' worth of gratuity payouts that occur at the end of five-year contract terms and whose income and positions are uncertain during a bridge contract period.  (*Id.* at 3.)

The law requires "due regard" be given "to the interests of national defense and national security."  28 U.S.C. § 1491(b)(3).  Nevertheless, State has not shown that it will suffer substantial harm from an injunction.  As for increased costs, GWFA is currently providing security services under a bridge contract that runs to August 2024, so State has already incurred much of the increased cost it seeks now to avoid.  The other asserted harms are too attenuated from genuine security concerns to outweigh the harm to the plaintiff if an injunction were denied.  In any event, the issues on which GWFA prevailed may be rectifiable in short order.  If not, State has eight months to cure the deficiencies in G4S's proposal, reissue the solicitation, or award the contract to the plaintiff.  In any event, any delay is attributable to State's failures to comply with the requirements, including a mandatory one, set out in the solicitation it drafted.

The balance of the hardship favors GWFA.

## C.    Public Interest

"Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid."  *Serco Inc. v. United States*, 81 Fed. Cl. 463, 502 (2008) (cleaned up).  The public interest militates in favor of injunctive relief, as State would otherwise be permitted to award a contract based on irrational decisions and without adequate explanation for the exercise of its discretion.

# VI.    CONCLUSION

The plaintiff has shown that State erred in evaluating G4S's proposal regarding G4S's experience, the letters of intent/employment agreements of key personnel, and the omitted information on G4S's affiliated businesses.  The plaintiff was prejudiced by the first two of these errors and was denied the opportunity to compete fairly under the solicitation.  The plaintiff has shown it is entitled to a permanent injunction enjoining the award of the contract to G4S and requiring State either to reconsider its evaluation of G4S's proposal or to take such other steps as permitted under procurement law.

The defendant has shown that State's evaluation of G4S's proposal regarding G4S's pricing, its ability to comply with the licensing requirement, and sufficiency of its biographic information was reasonable.

Accordingly, the plaintiff's motion (ECF 28) and the defendant's motion (ECF 31) for judgment on the administrative record are each granted in part and denied in part.

An order consistent with this opinion will be entered separately.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**